UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE ANTHONY FREEMAN,<br><br>　　　　Appellant,<br><br>　v.<br><br>ALAN ALBERT HENRY OW,<br><br>　　　　Appellee. | Case No.16-cv-04817-JST<br><br>**ORDER DENYING MOTION TO STAY BANKRUPTCY PENDING APPEAL**<br><br>Re: ECF No. 3 |

Before the Court is Appellant's motion to stay bankruptcy pending appeal to this Court. ECF No. 3. The Court denies the motion.

**I.   BACKGROUND**

　　**A.   Factual Summary[1]**

Appellee Alan Albert Henry Ow owns a single-family residence located at 5724 Alta Punta Avenue, El Cerrito, California. ECF No. 1-2 at 2. Ow lived at the property for his entire life until 2011, when it sustained significant fire damage and was declared uninhabitable by the City of El Cerrito. Id.; ECF No. 3-2 at 6. Lacking the funds to repair the fire damage, Ow became homeless, living with friends or in local motels. ECF No. 1-2 at 2. After defaulting on his mortgage in March 2013, Ow unsuccessfully tried to obtain a loan modification and initiate bankruptcy proceedings. Id.; ECF No. 3-2 at 7. Notwithstanding these efforts, the bank noticed a trustee's sale of his home for June 6, 2014. ECF No. 1-2 at 2.

In May 2014, Ow met Appellant George Anthony Freeman through a friend. Id. Freeman told Ow that he knew third parties (Mario Oropeza and Karen Passentine) who were interested in

---

[1] The Court takes much of this this factual summary from the bankruptcy court's Memorandum After Trial. ECF No. 1-2. In addition, the Court takes judicial notice of the transcript from the trial proceedings in the bankruptcy court pursuant to Federal Rule of Evidence 201. See Request for Judicial Notice, ECF No. 3-2.

purchasing the party for $300,000, and Freeman offered to pay the outstanding mortgage payments to prevent foreclosure until Ow could sell the property. Id. at 2-3. In exchange, Freeman requested a 35 percent interest in the property. Id.

On May 30, 2014, just a week before the scheduled trustee's sale of the property, Ow and Freeman signed an agreement to that effect ("May 2014 Agreement"). Id. at 3. Under that agreement, Freeman would pay $24,200.70 in mortgage arrears in exchange for a 35 percent ownership interest in the property, and Oropeza and Passentine would have the right to purchase the property for $300,000 after specified repairs. Id. The agreement also contained an addendum providing that Ow would receive a minimum of $120,000 from the proceeds of the home. Id.

Pursuant to the May 2014 Agreement, Freeman paid $24,200.70 to cure the arrears, and Citimortgage withdrew the trustee's sale. Id. Freeman subsequently made four or five subsequent monthly loan payments to Citimortgage to prevent further foreclosure efforts. Id. at 4. Freeman also paid to clean the property in advance of the sale and gave Ow some money for his own personal use. Id.; ECF No. 3-2 at 15. The bankruptcy court later estimated that Freeman spent a total of $38,960.50 on the property. ECF No. 1-2 at 4.

Freeman referred Ow and the purchasers of the property to real estate agent Jeremy Lebeau, who prepared a purchase agreement for the property. Id.; ECF No. 3-2 at 28-29. On July 8, 2014, Ow and the purchasers entered into a real estate purchase agreement. ECF No. 1-2 at 4.

On July 29, 2014, at the behest of the title company responsible for the sale escrow, Freeman and Ow agreed to convert Freeman's 35 percent interest into a deed of trust and a promissory note in the amount of $105,000 upon the close of escrow ("July 2014 Agreement"). ECF No. 3-2 at 47-48; ECF No. 1-2 at 3. The title company recorded the deed of trust on August 5, 2014. ECF No. 1-2 at 3.

In October 2014, the purchasers requested a cancellation of the purchase agreement, but then withdrew that cancellation request only a few days later. ECF No. 3-2 at 40-41. Despite the withdrawal, Ow accepted their cancellation request a month later. Id. After the sale was cancelled, Freeman stopped making the monthly mortgage payments and Citimortgage recorded a notice of default on the property. ECF No. 1-2 at 4.

### B. Procedural History

On June 8, 2015, Ow filed the underlying bankruptcy proceedings to stay the foreclosure. Id. In the adversary proceeding at issue in this appeal, Ow sought declaratory relief that both the May 2014 Agreement and the July 2014 Agreement were unconscionable under California law and therefore void. Id. at 1, 5.

On August 5, 2016, the bankruptcy court agreed with Ow, finding both agreements procedurally and substantively unconscionable. Id. at 5-8. To support its finding of "significant substantive unconscionability," the bankruptcy court explained that both contracts were "overly harsh and not justified by their circumstances" because "in exchange for $38,960.50, Freeman expected a return of $105,000 in a matter of months," noting that this "rate of return would have exceeded 250%." Id. The court found that this high rate of return was not justified in light of the fact that "Freeman entered into the transaction with substantial equity in the El Cerrito Property and a buyer at hand." Id. Given the circumstances, the court explained that "Freeman's investment was not a high risk venture," but rather "easy money." Id. The court relied on a case called Carboni v. Arrospide, in which a California court refused to enforce an excessive interest rate on a loan because "at some point the price [of the money lent] becomes so extreme that it is unconscionable." Id. (quoting Carboni v. Arrospide, 2 Cal. 4th 76, 82 (1991)).

With respect to procedural unconscionability, the bankruptcy court found that "Ow had little, if any, bargaining power, and this left him without any meaningful choice." Id. Specifically, the court pointed to the fact that Ow "was homeless, distraught over the pending trustee's sale, and desperate to save his childhood home" at the time he approached Freeman. Id. The court explained that the terms of Ow's deal with Freeman, which "ultimately provided Freeman with a secured claim worth far more than the amount financed," were "the product of a substantially uneven playing field." Id. The court concluded that these facts, when combined with the evidence of "significant substantive unconscionability," were sufficient to render the May 2014 Agreement, the deed of trust, and the promissory note unenforceable. Id. Freeman was therefore only entitled to a general unsecured claim for the $38,960.50 that he spent on the property. Id.

## II. JURISDICTION

This court has jurisdiction to hear appeals from final judgments issued by bankruptcy courts pursuant to 28 U.S.C. § 158(a).

## III. LEGAL STANDARD

A court's "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). A stay is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case. The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Nken v. Holder, 556 U.S. 418, 433–34 (2009) (internal alterations, citations, and quotations omitted).

To decide whether a stay pending appeal is warranted, district courts consider four factors: (1) whether the movant has made a strong showing that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether a stay will substantially injure other parties to the proceeding; and (4) the public interest implicated by the grant or denial of the stay. Id. at 434; see also Leiva–Perez v. Holder, 640 F.3d 962, 964 (9th Cir. 2011).

In the district court, as in the court of appeals, "[t]he bankruptcy court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed *de novo*." In re JTS Corp., 617 F.3d 1102, 1109 (9th Cir. 2010) (quoting In re Strand, 375 F.3d 854, 857 (9th Cir. 2004)). "Mixed questions of law and fact are reviewed *de novo*." In re JTS Corp., 617 F.3d at 1109 (quoting In re Chang, 163 F.3d 1138, 1140 (9th Cir. 1998)).

## IV. ANALYSIS

### A. Federal Rule of Bankruptcy Procedure 8007

As a preliminary matter, a motion for a stay pending appeal must ordinarily be presented to the bankruptcy court in the first instance. See Fed. R. Bankr. P. 8007(a)(1). Therefore, Freeman must either show that making such a motion would be impracticable or, if such a motion was made, state whether the bankruptcy court has ruled on it and set out any reasons given for the ruling. Fed. R. Bankr. P. 8007(b)(2).

Freeman explains that he filed a similar motion to stay with the bankruptcy court, but his attorney failed to appear at the hearing and the motion was subsequently denied due to lack of prosecution. ECF No. 3 at 2. Appellant then filed a motion for relief in the bankruptcy court, explaining that his attorney missed the hearing based on a scheduling mistake. Id. The bankruptcy court denied the motion on the ground that it no longer had jurisdiction to reconsider its previous order given that a notice of appeal had already been filed. Id.; see also Ow v. Freeman, Case No. 15-04069 (N.D. Cal. Bankruptcy Ct.), ECF No. 62 (citing In re Ho, 265 B.R. 603, 605 (B.A.P. 9th Cir. 2001) ("[T]he court cannot *reconsider* an earlier decision denying a stay (and thus belatedly impose one) after a notice of appeal is filed.").

The Court finds that Freeman has satisfied the requirements of Rule 8007, and so turns to the merits of Freeman's motion.

**B. Likelihood of Success on the Merits**

To demonstrate a likelihood of success on the merits, the movant "need not demonstrate that it is more likely than not that they will win on the merits." Leiva-Perez v. Holder, 640 F.3d 962, 968 (9th Cir. 2011). However, the movant must show that he "has a substantial case for relief on the merits." Id. Freeman has not done so here.

Under California law, a court may refuse to enforce a contract if it finds that the contract was unconscionable at the time it was entered. See Cal. Civ. Code § 1670.5. "One common formulation of unconscionability is that it refers to an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Sanchez v. Valencia Holding Co., LLC, 61 Cal. 4th 899, 910 (2015) (internal quotation marks and citations omitted). "As that formulation implicitly recognizes, the doctrine of unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." Id. "The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." Id. (emphasis in original). However, both elements "need not be present in the same degree," and courts use a sliding scale in which "the

5

1   more substantively oppressive the contract term, the less evidence of procedural unconscionability
2   is required to come to the conclusion that the term is unenforceable, and vice versa." Id. (quoting
3   Armendariz v. Foundation Health Psychcare Services, Inc., 24 Cal. 4th 83, 114 (2000).

4   Freeman argues on appeal that the bankruptcy judge erred by treating the two separate
5   agreements as a single agreement, thereby failing to examine the circumstances of each individual
6   contract at the time it was entered into. ECF No. 3 at 10-12. Freeman argues that, when viewed
7   individually, neither agreement is substantively or procedurally unconscionable. Id. at 12-18. In
8   response, Ow argues that, "[w]hether the transactions are treated separately or otherwise, the result
9   was clearly unconscionable." ECF No. 6 at 4.

10  Freeman is correct that "substantive unconscionability must be evaluated as of the time the
11  contract was made." A & M Produce Co. v. FMC Corp., 135 Cal. App. 3d 473, 487 (Ct. App.
12  1982); accord Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1172 (9th Cir. 2003) (quoting A &
13  M Produce, 135 Cal. App. 3d at 487). The Court therefore analyzes each agreement—the May
14  2014 Agreement and the July 2014 Agreement—based on the circumstances at the time they were
15  entered into. Even when considered individually, however, the agreements exhibit the hallmarks
16  of both substantive and procedural unconscionability. As a result, Freeman has not shown a
17  likelihood of success on the merits of his appeal.

### 1. May 2014 Agreement

19  First, the circumstances surrounding the May 2014 Agreement demonstrate that Ow had
20  neither equal bargaining power nor meaningful choice, which indicates that the agreement was
21  procedurally unconscionable. That contract was entered into on May 30, 2014, just one week
22  before the scheduled trustee's sale of the property. At the time, Ow was homeless and desperate
23  to save his childhood home. He had already unsuccessfully tried to modify his mortgage loan, and
24  an earlier bankruptcy had failed because Ow could not make his plan payments. The bankruptcy
25  court also noted that Ow "unhesitatingly testified that he had no [sic] choice but to sign the May
26  30th contract." ECF No. 1-2 at 5. In addition, both Ow and his friend testified at trial that
27  Freeman "constantly rushed him to sign the various documents," "refused to give him complete
28  copies of the documents that he signed," and "told him that he did not need an attorney to review

6

the transaction." Id. The evidence therefore suggests that Ow did not have any other viable options available to him.

Second, the terms of the May 2014 Agreement are overly harsh and unreasonably favor Freeman, which suggests that the agreement was substantively unconscionable. Under the terms of that agreement, Freeman agreed to make an initial payment of just $24,200.70 in mortgage arrears in exchange for an immediate 35 percent equity interest in a property that he knew to be worth at least $300,000[2] – a return of over 330 percent. Indeed, Freeman had already found third-party buyers who were willing to purchase the property for $300,000 at the time he entered into agreement, and those third-party purchasers were mentioned in the agreement itself. Despite knowing that the property would likely sell for $300,000, and therefore that a 35 percent equity interest would translate into roughly $105,000 for himself within a matter of months, Freeman agreed to pay just $24,200.70 in mortgage payments.

The bankruptcy court's analogy to a California case called Carboni underscores both the procedural and substantive unconscionability of the May 2014 Agreement. In that case, the court held that a 200 percent annual interest rate on a personal loan was substantively unconscionable. Carboni v. Arrospide, 2 Cal. App. 4th 76 (1991). The court found the interest rate unconscionable in part based on the disparity between the price of the credit and its actual value as suggested by the prevailing interest rate in the credit market for similar loans. Id. at 84. Specifically, the court noted that "the price of the credit was approximately *10 times* its true value." Id. (emphasis in original). The court further explained that the high interest rate was not justified by the circumstances of the transaction. Id. at 84-85. In addition, the court found that the high interest rate was procedurally unconscionable because the borrower was acting under emotional distress when he entered into the agreement: he needed the money so he could pay his parents' medical

---

[2] Freeman also orally agreed to pay Ow some money for his personal use and to make additional payments to keep the mortgage current, but it is not clear from the record currently before this Court how much either Freeman or Ow expected that amount to be at the time they entered into the May 2014 Agreement. Since the bankruptcy court ultimately estimated that Freeman spent a total of $38,960.50 on the property and Ow's personal expenses, an amount that is still almost three times less than the value of Freeman's stake in the property, it does not alter this Court's substantive unconscionability analysis. ECF No. 1-2 at 4.

expenses and he had unsuccessfully tried to obtain a loan from other sources. Id. at 85-86.

As in Carboni, the gross disparity between the price that Freeman paid for his 35 percent equity interest in the property ($24,200.70 plus unspecified additional expenses) and the actual value of his stake in the property (approximately $105,000) suggests that the agreement was substantively unconscionable. Although the disparity does not reach the tenfold level in Carboni, the Carboni court cited to other cases in which courts found substantive unconscionability where "the price of the commodities was only three to four times their true value." Id. (citing Jones v. Star Credit Corp., 298 N.Y.S.2d 264 (Sup. Ct. 1969) and Frostifresh Corp. v. Reynoso, 281 N.Y.S.2d 964 (App. Term 1967)). Here, the true value of Freeman's stake in the property was more than four times the amount he agreed to pay for it. Moreover, Ow accepted these overly harsh terms in an effort to save his childhood home after unsuccessfully trying to obtain a mortgage loan modification and filing for bankruptcy. These circumstances are comparable to the circumstances that the Carboni court found sufficient to support a finding of procedural unconscionability.

In response, Freeman argues that Carboni does not apply because that case dealt with a high interest rate on a loan, whereas this case deals with the purchase of equity. ECF No. 3 at 11-13. The distinction is not material, because the same considerations apply with equal force. The Carboni court noted that it could find no case that applied the doctrine of unconscionability to a shockingly high rate of interest on a loan, so it analogized to cases finding unconscionability on the basis of gross price disparity. Id. at 81-82. To justify this analogy, the court explained that "the interest rate is the 'price' of the money lent; at some point the price becomes so extreme that it is unconscionable." Id. So here, regardless of whether the May 2014 Agreement is characterized as a loan or the purchase of equity, the disparity between the price that Freeman paid for his property interest and its true value suggests substantive unconscionability.

Freeman next argues that, even if there is a disparity between the amount Freeman paid and his expected return, that disparity was justified because Ow was a high-risk investment. ECF No. 3 at 11-13. Freeman points to the following facts to support that argument: Ow was unemployed and had no source of income, Freeman had little time to appraise the property

8

because of the upcoming foreclosure, the property was uninhabitable and fire-damaged, and the property was not insured. Id. Although these considerations suggest that the purchase entailed some risk, any potential risk was largely negated by the fact that Freeman had already found buyers who were willing to purchase the property for $300,000 at the time he entered into the May 2014 Agreement.

Freeman also attempts to distinguish Carboni's finding of procedural unconscionability from the present case. ECF No. 3 at 17-18. Specifically, Freeman argues that Ow's level of emotional distress when he entered into the May 2014 Agreement did not rise to the level of distress at issue in Carboni because Ow was not trying to pay for a family member's medical expenses, but rather simply trying to obtain more money through a private sale of the property than would otherwise be obtained through foreclosure. Id. Freeman also argues that the bankruptcy court should not have considered Ow's living situation (i.e., that he was homeless) because Ow had not been living in the property. Id. In addition, Freeman argues, Ow had a meaningful choice because he had other options, such as allowing the foreclosure to continue, filing for bankruptcy, or seeking other sources of funding. Id. With respect to Ow's bargaining power, Freeman argues that a finding of procedural unconscionability is undercut by the fact that Ow wrote the addendum attached to the May 2014 Agreement that entitled him to a minimum of $120,000 from the proceeds of the sale. Id.

Freeman's attempts to distinguish Carboni are unavailing. Although Ow was not living in the property at the time he entered into the May 2014 Agreement with Freeman, he had been living in it his entire life until 2011 when it was declared uninhabitable after the fire. In addition to being his childhood home, the property appears to be Ow's only asset, which he owns both in an individual capacity and as trustee of his mother's trust. The prospect of losing this asset for less than its full value through a trustee's sale likely exerted an immense pressure on Ow that was similar to the pressure of having to pay an ill parent's medical expenses. This, combined with Ow's homelessness and desperate need of money to cure outstanding mortgage payments, undoubtedly contributed to Ow's lack of bargaining power at the time he entered the May 2014 Agreement. Moreover, Ow had exhausted at least some of the alternative options that Freeman

9

points to, such as filing for bankruptcy. ECF No. 3-2 at 38:20-22; id. at 13:1-4 (testifying that he was not given any choices at the time the agreement was presented to him). Ow also testified that he "tried to find some help from other sources" after the bankruptcy was dismissed. Ow v. Freeman, Case No. 15-04069 (N.D. Cal. Bankruptcy Ct.), ECF No. 31 at 6:4-6. Finally, with respect to the addendum, Ow testified that the addendum was in Mr. Freeman's handwriting. ECF No. 3-2 at 31:13-17. And, although Ow responded "[s]ure" when asked whether he had negotiated the agreement with the addendum, he repeatedly testified that he did not read the documents or understand the basic terms because he trusted Freeman. See, e.g., id. at 32:20-25; 35:11-13; 37:11-18. The court also gives substantial deference to the bankruptcy court's factual finding that "Ow generally could not explain what documents he signed or why he signed them, other than to say he 'trusted' Freeman." ECF No. 1-2 at 2. All of these factual circumstances suggest that Ow did not have equal bargaining power or viable alternatives at the time he entered into the May 2014 Agreement.

Lastly, Freeman tries to discredit the precedential value of Carboni by pointing to De La Torre v. CashCall, Inc., 56 F. Supp. 3d 1105 (N.D. Cal. 2014), judgment entered, No. 08-CV-03174-MEJ, 2014 WL 7277377 (N.D. Cal. Dec. 22, 2014). However, the court in that case did not even reach the issue of unconscionability because it determined that, "[e]ven if Plaintiffs were able to prove that the challenged loans were unconscionable, the Court could provide no remedy without impermissibly intruding upon the legislature's province." Id. at 1109. The court reasoned that any judicial decision regarding the unconscionability of the challenged interest rates would necessarily "intrude in matters of economic policy" because the California Legislature had expressly decided *not* to cap interest rates on loans exceeding $2,500. Id. at 1109-10. No such legislative determinations are implicated in this case.

In sum, Freeman has not made a substantial case on the merits of his argument that the May 2014 Agreement was neither procedurally nor substantively unconscionable.

### 2. July 2014 Agreement

The July 2014 Agreement to convert Freeman's 35 percent equity interest into a promissory note in the amount of $105,000 shows similar signs of both substantive and procedural

10

1    unconscionability.  The July 2014 Agreement involves a similar price disparity in which Freeman
2    expected $105,000 in exchange for just $38,960.50, the total amount of money he had invested in
3    the property.  Again, this price disparity lacked a reasonable basis given the low-risk nature of the
4    investment.  By July 2014, Freeman had not only found buyers, he had referred the buyers to a
5    real estate agent and the purchase was already underway.  As in Carboni, this gross disparity
6    between price and value strongly suggests substantive unconscionability.  It is also notable that
7    this conversion meant that Freeman would recover $105,000 regardless of whether the sale went
8    through, whereas Ow did not receive any consideration in return for this added assurance.

9          The factual circumstances surrounding the July 2014 Agreement also suggest unequal
10   bargaining power.  Although the property was no longer in immediate risk of default, that state of
11   affairs was contingent on Freeman's continued fulfillment of his promise to pay the monthly
12   mortgage payments for Ow.  In addition, Ow was still homeless and presumably still relying on
13   Freeman's financial support to satisfy his personal necessities.

14         Freeman argues that the July 2014 Agreement was not unconscionable because Ow and his
15   agents—namely, the escrow officer for the title company and the real estate agent—requested the
16   conversion of the equity interest into debt.  But Ow was not, as Freeman suggests, "the drafting
17   party" of the July 2014 Agreement.  ECF No. 3 at 14.  To the contrary, Ow testified that he did not
18   even know how Freeman arrived at the $105,000 amount.  ECF No. 1-2 at 4.  He further testified
19   that $105,000 "was just what [Freeman] came up with."  Ow v. Freeman, Case No. 15-04069
20   (N.D. Cal. Bankruptcy Ct.), ECF No. 31 at 21:12-16.  Even when Ow signed documents with Ms.
21   Skipper (the title company's escrow agent), he did so at the direction of Freeman.  ECF No. 3-2 at
22   35.  It is also notable that Freeman referred Ow to the real estate agent, whom Ow never met with
23   in person.  ECF No. 3-2 at 28:24-29:20.  Instead, Ow simply went to Freeman's office to fill out
24   paperwork for the agent when necessary.  See id.

25         Because the terms of and the circumstances surrounding the July 2014 Agreement
26   similarly suggest both substantive and procedural unconscionability, Freeman has not shown that

1  he is likely to succeed on the merits with respect to that agreement, either.[3]

2  **C. Irreparable Harm to Movant**

3  Freeman argues that he will suffer irreparable harm absent a stay because he will be left with a lesser-value unsecured claim that may not be satisfied under the current bankruptcy plan. ECF No. 3 at 8-9. Specifically, Freeman argues that the bankruptcy plan contemplates Ow entering into a transaction with a new investor who would have a $135,000 lien on the property. Id. In response, Ow argues that, regardless of whether Freeman is a secured or an unsecured creditor, he will not suffer irreparable harm because his injury is compensable with monetary damages. ECF No. 6 at 4.

"Purely monetary injuries are not normally considered irreparable" because they can be remedied by a damages award later. See Lydo Enterprises, Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984). The same rule applies in the context of bankruptcy proceedings. See 8B C.J.S. Bankruptcy § 1285 ("Economic injury alone does not support a finding of irreparable harm because such injury can be remedied by a damage award."). For that reason, courts have declined to stay bankruptcy proceedings pending appeal where "[t]he only harms [appellant] has put forth are economic in nature." In re Irwin, 338 B.R. 839, 853–54 (E.D. Cal. 2006) (holding that potential loss of monetary recovery caused by the sale of property pending appeal of the bankruptcy court's decision would not cause irreparable harm).

As in Irwin, Freeman will suffer only monetary injury absent a stay of the bankruptcy

---

[3] Freeman also argues that the bankruptcy court improperly allowed Ow to use the unconscionability doctrine as an affirmative cause of action when it can only be used as a defense. ECF No.3 at 19. "[W]hile unconscionability cannot stand alone, it can be the basis for another claim." In re First All. Mortg. Co., 280 B.R. 246, 251 (C.D. Cal. 2002) (citing Perdue v. Crocker National Bank, 38 Cal.3d 913 (1985)); Gaitan v. Mortg. Elec. Registration Sys., No. EDCV09-1009 VAP MANX, 2009 WL 3244729, at *13 (C.D. Cal. Oct. 5, 2009) ("Unconscionability may be raised as a defense in a contract claim, or as a legal argument in support of some other claim, but it does not constitute a claim on its own."). Here, Ow did not bring an affirmative cause of action for unconscionability; rather, unconscionability was simply the basis for Ow's rescission claim in the adversary proceeding. See Bankruptcy Petition No. 15-41959 (N.D. Cal.), ECF No. 15 (bringing a claim for rescission).

proceedings.[4]  Even if the property is sold, as Freeman argues that it will be, any harm to him will be purely economic.  After all, Freeman does not live in the property and the property has no personal value to him, just monetary value, such that any harm to Freeman's commercial interest in the property can be remedied through monetary damages.  See In re Coyle, No. 15-CV-04126-YGR, 2016 WL 5673247, at *8 (N.D. Cal. Oct. 3, 2016) ("Where the harm absent an injunction is loss of an interest in a commercial property, such loss is 'easily calculable and compensable in damages' upon conclusion of the litigation.").  He will therefore not suffer irreparable harm absent a stay.

### D.  Substantial Injury to Other Parties and Public Interest

"Because Appellant fails to satisfy the first two factors, his motion necessarily fails."  In re Woodcraft Studios, Inc., No. C-11-3219 EMC, 2012 WL 160225, at *3 (N.D. Cal. Jan. 18, 2012) (citing Nken, 129 S. Ct. at 1762).  Thus, the Court need not reach the two remaining factors: whether a stay will substantially injure other parties to the proceeding, and the public interest implicated by the grant or denial of the stay.

The Court evaluates them nonetheless, and finds that both factors weigh against the issuance of a stay.  Ow's bankruptcy proceedings were commenced in June 2015, almost eighteen months ago.  He will suffer substantial injury if the confirmation of his bankruptcy plan and the sale of his property are further delayed, especially because the interest on his debt continues to accrue in the interim.  The remaining creditors will also be harmed by further delay.  See Lynch v. California Pub. Utilities Comm'n, No. C-04-0580 VRW, 2004 WL 793530, at *3 (N.D. Cal. Apr. 9, 2004) (holding that "delay of payment constitutes significant harm warranting the denial of a stay").  "[T]he public interest in speedy and accurate bankruptcy proceedings" similarly counsels

---

[4] One district court has distinguished Irwin to find irreparable harm where a creditor stands to lose a *first-position* lien, which necessarily has value as long as the property itself has value.  See JPMCC 2007-CIBC 19 E. Greenway, LLC v. Bataa/Kierland, LLC, No. 2:11-BK-05850-RJH, 2013 WL 210845, at *5 (D. Ariz. Jan. 18, 2013).  The present case is more analogous to Irwin: Freeman has at most a second-position lien, and the trustee recently objected to Ow's bankruptcy plan because "the property is underwater and lacks any equity so its sale will not fund the plan."  See Bankruptcy Petition No. 15-41959 (N.D. Cal.), ECF No. 72.  Given that Freeman is unlikely to recover anyway, an unsecured claim for monetary damages is an adequate remedy.

against a stay.  See In re N. Plaza, LLC, 395 B.R. 113, 127 (S.D. Cal. 2008).

**CONCLUSION**

None of the relevant factors weigh in favor a stay of the bankruptcy proceedings pending appeal.  Freeman's motion is denied.

IT IS SO ORDERED.

Dated:  November 16, 2016

_____
JON S. TIGAR
United States District Judge